# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY MARCUS WIGGINS,<br><br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:16-cv-01788-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 18, 21, 22) |

## I.

## INTRODUCTION

Plaintiff Timothy Marcus Wiggins ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from diabetes mellitus type II, hypertension, and gastroparesis. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

///

///

---
[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 7, 8.)

1

# II.

# FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed a Title XVI application for supplemental security income on January 28, 2013, alleging disability beginning January 15, 2010. (AR 180-188.) Plaintiff's application was initially denied on April 10, 2013, and denied upon reconsideration on September 12, 2013. (AR 119-122, 127-132.) Plaintiff requested and received a hearing before Administrative Law Judge Laura Fernandez ("the ALJ"). Plaintiff appeared for a hearing on January 29, 2015. (AR 27-87.) On June 16, 2015, the ALJ found that Plaintiff was not disabled. (AR 8-22.) The Appeals Council denied Plaintiff's request for review on September 19, 2016. (AR 1-3.)

### A. Relevant Hearing Testimony

Plaintiff appeared with counsel and testified at the hearing on January 29, 2015. (AR 27-87.) He lives with a friend in a second floor apartment in a building with stairs. (AR 32-33.) He has children between the ages of 10 and 25 that he tries to see at least once a week. (AR 33.)

He does not have a driver's license, so gets around by walking, public transportation, or getting rides with friends. (AR 33-34.) He receives general relief, food stamps, and medical care. (AR 34.) He did not graduate high school and he does not have his GED. (AR 34.) He completed the 10th grade and did not start the 11th grade. (AR 34.) He was not in special education classes in school. (AR 34-35.) He has not done any vocational training or job related training. (AR 35.)

He is not currently working and the last time he worked was in approximately 2006 at Sierra Display Installations as a driver and installer of Christmas decorations and banners.[2] (AR 35-36.) He worked there on a seasonal basis for three months in 2005 and 2006. (AR 36.) He lifted boxes that were at least 50 lbs. (AR 37.) Prior to that job, he worked at Pool Kingdom in a pool service technician job for a couple of months during the summer on a part-time basis. (AR 37.) Prior to that, he worked at Wienersnitzel, the hot dog place. (AR 37.) He also worked in a group home called Quantity Quality Group Home Service in 2003. (AR 37-38.) He did not

---

[2] However, he also worked at On Demand Staffing in 2008 and 2010, which were minimum wage part-time jobs. (AR 40.)

work in 2000. (AR 38.) He worked at Copper and Brass, a metal warehouse company, doing data entry in 1998 through 1999. (AR 42-43.) He had a series of short-term jobs, including working at Dollar Tree and Fresno Youth Care Homes. (AR 38-39.) His work history was spotty with several small jobs because he did not have a way of getting to work at times. (AR 39.) He quit the Wiernersnitzel and Dollar Tree jobs because they were not enough hours, but he stopped working at the group home because he was diagnosed with diabetes and not able to go back right away. (AR 39-40.) He stopped working at Sierra Display Installations because of his diabetes. (AR 39.)

He was unable to work because he was sick and he was not eating well as far as getting the proper nutrition. (AR 40.) In addition, getting home from work was a problem. (AR 40.) He states that his diabetes keeps him from working because he has a problem with lifting things, he gets nauseated in the morning and vomits, he has to urinate every 30 minutes, he can stand for about 20 minutes, and he gets lightheaded when he carries things. (AR 40-41.) He thinks the nausea is caused by his digestive system digesting slower than normal. (AR 41.) He vomits at least 6 or 7 times every morning, which causes fatigue, high blood pressure, headaches, and decay in his teeth. (AR 67-68.) He has an issue with his eyesight where he misses a lot of small print. (AR 41.) He was diagnosed with diabetes in April 2003 and his nausea started in 2008. (AR 70-71.)

He is also unable to work because of mental problems, such as hearing voices and issues socializing with people. (AR 43.) He has been hearing voices for a year and a half. (AR 43-44.) He also gets depressed every day because he is mad and upset about his condition. (AR 45.) The depression or anger gets worse when he has his morning nausea and vomiting. (AR 45.) He states there is nothing that the doctors have given him that makes it better and nothing that he does makes it better. (AR 45.) He has had the depression for four years. (AR 47.) He has told his doctors about his altercations and outbursts of anger and they referred him to Patty Newsome, a counselor at Fresno Community Regional Medical Center. (AR 53-55, 75.) He has been seeing her for his depression for a couple of months on a monthly basis for one-on-one sessions. (AR 53-55.) He did not start seeing a counselor earlier because it is hard for him to open up to

someone. (AR 54.) He was scheduled to start group sessions in March 2015. (AR 55.) His anger issues and altercations cause him to have a difficult time being around other people. (AR 76.)

He experiences pain in his stomach at least 5 or 6 times a week that lasts for 6 or 7 hours each time. (AR 44.) The pain is a sharp pain that feels like a knot and then he gets a burning sensation. (AR 44.) The pain is brought on by food and digestion. (AR 44-45.) He states that there is nothing he can do to make it better or go away. (AR 45.) He has not been given painkillers, but he takes what they give him and it helps the pain. (AR 45.)

He also has shoulder pain from the injections for his diabetes, but the pain goes away after a while following the shot. (AR 46.) When he gets ready for bed, his legs start tingling, aching, and throbbing. (AR 46.) He has been experiencing this leg pain every night for 4 years. (AR 46-47.) He has discussed his leg pain with his doctor who states that he is going to put him on a nerve pain medication, but the doctor has not done so yet. (AR 47.)

He has had high blood pressure that is not under control for over 16 months. (AR 57.) His high blood pressure causes him to get a tremendous headache and then he sees little white specks or stars. (AR 57, 75.) He has been seeing the white specks for about a year when his blood pressure is high and he bends down and rises back up, so it is part of being lightheaded. (AR 75-76.) He has talked to his doctor about the headaches and seeing the specks. (AR 57.) He thinks his blood pressure spikes with the gastroparesis. (AR 72.) He does not have a blood pressure machine, but his roommate just bought one the night prior to the hearing and Plaintiff's blood pressure was 148/98. (AR 72.)

He sees a primary physician, Paul Simon, for his diabetes and gastroparesis every two to three months, but he would like to see the doctor every month. (AR 47-48.) He goes to Fresno Community Regional Medical Center to see all of his doctors and he sees a stomach doctor there every two months. (AR 48.) He has been going to the emergency room on a frequent basis because of the nausea, vomiting five or six times within two hours, and the pain. (AR 48-49.) When he is at the emergency room, he receives nausea medication and pain medication, and if his sugar is high, insulin. (AR 49.) They tell him to come in if he is in pain or he gets worse.

4

(AR 49.) The last time he went to the emergency room was October 2014 because of his blood sugar. (AR 50.)

He takes the medications for his diabetes daily like he was instructed. (AR 50-51.) He takes his insulin four times a day. (AR 69.) He checks his blood sugar twice a day, once in the morning and once in the evening. (AR 51.) The last time he checked his blood sugar was the morning of the hearing. (AR 51.) He is on a diabetic diet with a lot of soups. (AR 51.) He walks to the park and back for a total of an hour and a half two or three times a week, although he says three times a week as he is trying to exercise more now. (AR 52.) When he takes his insulin regularly, his sugars are still running high at 200 or higher. (AR 71.) His A1C level is high. (AR 71.)

His diabetes is uncontrolled. (AR 52.) He says that his new doctor is telling him what he needs to work on to improve his diabetes, but his old doctor did not talk to him like his new one does. (AR 53.) His new doctor is having him work on his cholesterol, the fasting blood sugar, A1C level. (AR 53.) The fasting blood sugar had been more than high for five years, so he is working on that. (AR 53, 71.) He had 4 DKA episodes in the prior year where he was admitted to the hospital for at least 2 to 3 days. (AR 72.) He has also told his new doctor about seeing white specks. (AR 76.)

He testified that he is not a smoker, but then he stated that he smokes 5 cigarettes a week and that his last cigarette was last weekend. (AR 55-56.) He had quit at the end of 2008, but he started smoking again two weeks ago. (AR 76-77.) He does not drink alcohol or use illegal drugs. (AR 56.) He does not attend AA or any programs. (AR 56.)

He is able to sit comfortably for 15 to 20 minutes and stand for 20 minutes. (AR 57-58.) The issue with him sitting for a longer period of time is that he hears voices so he is unable to sit still. (AR 73.) There is no pain that is causing him to have issues with sitting. (AR 73.) He cannot stand for longer than 20 minutes because his back starts feeling tired or tight. (AR 73.) He no longer has much energy. (AR 73.) When asked about walking and his hour and a half walks to the park, Plaintiff testified that he can walk for 20 minutes before stopping for about 10 to 15 minutes before "complet[ing] it." (AR 58.) He can lift 15 lbs. (AR 58.) He has no

restrictions on the use of his arms. (AR 58.) For his legs, he gets the nerve pain at night and then he gets a pain at least twice a day when he sits. (AR 58-59.)

He usually wakes up around 5:30 or 6:00 in the morning and is nauseated and vomiting until about 12:00 p.m. or 1:00 p.m. (AR 59.) He gets tired from vomiting, so he rests until about 2:00 p.m. or 3:00 p.m. (AR 59-60.) He then eats something such as soup and sits there frustrated. (AR 60.) He sometimes goes outside to sit on the steps. (AR 62.) He goes to bed around 9:00 p.m. or 10:00 p.m., but he cannot sleep through the night. (AR 65.) He takes his insulin, high blood pressure medication, and acid reflux medication when he wakes up in the morning on an empty stomach. (AR 61.) He is not supposed to take his medication on an empty stomach, but he is afraid to eat and he has told his doctor that he takes his medications on an empty stomach. (AR 61.) He enjoys reading and is able to comprehend the newspaper. (AR 35.) He testified that he thought he would need to rest for 10 minutes after walking two or three blocks before getting on the bus. (AR 74.) When he takes a shower, he becomes exhausted fast, so he takes baths. (AR 74.)

He feels better when he sees his kids. (AR 62.) He saw his kids the previous weekend when they came over to where he is living and they watched the football game. (AR 62-63.) He was sitting at the kitchen table and then on the floor in the living room at times. (AR 63.) He does not see anybody else on a regular basis. (AR 63.) He does not do any household chores, except vacuuming, sweeping, and mopping. (AR 63.) He has been going to church for about a month. (AR 64.) He likes watching football and basketball. (AR 64.) He went to a Fresno State basketball game the other night with his roommate. (AR 64-65.) He watches games if someone offers. (AR 64.) He states that his roommate is the only one who gets him out and doing things. (AR 64-65.) He goes out for recreation with his roommate two times a month. (AR 65.) Besides going to games, they go to his roommate's uncle's house and his roommate's daughter's house. (AR 65.)

He has two good days a week where he talks to himself about it being a good morning. (AR 69.) He is worried that when he eats he will become nauseous, but that happens even when he does not have anything in his stomach. (AR 70.) He has dry heaves where he vomits saliva.

(AR 70.) During the good days, he does not vomit, but still has nausea and dry heaves. (AR 70.) They have not found anything to make it better, but they have told him to watch his carbohydrates and foods that upset his stomach such as meat, beans, and bread. (AR 70.) He thinks his stomach becomes upset because those foods take a long time to process and have a tendency to get sour in his stomach. (AR 70.)

A vocational expert, Judith L. Najarian, also testified at the hearing. (AR 78-86.)

**B.  ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff has not engaged in substantial gainful activity since January 28, 2013, the application date.

- Plaintiff has the following severe impairments: diabetes mellitus, uncontrolled, with gastroparesis.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments;

- Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can never climb ladders or scaffolds, and can sustain only occasional exposure to unprotected heights, moving mechanical parts, extreme cold, or extreme heat.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on October 22, 1968, and was 44 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

- Plaintiff has a limited education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not he has transferable job skills.

- Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, since

January 28, 2013, the date the application was filed.

(AR 13-22.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred by failing to provide clear and convincing reasons to reject his testimony and specific reasons germane to Tamala Reed to reject her lay witness testimony. Defendant counters that the ALJ provided reasons that are properly supported and sufficiently specific to discount Plaintiff's allegations and any error by the ALJ in rejecting Ms. Reed's statements was harmless.

### A. Plaintiff's Credibility

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to

produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that his impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Then "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged limitations, but did not find Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms entirely credible for the reasons explained in the decision. (AR 16.) Plaintiff asserts that the ALJ only rejected Plaintiff's

statements because Plaintiff's purported poor compliance with his diabetic medication regime was the cause of his severe symptoms. However, the ALJ rejected Plaintiff's credibility based upon his failure to comply with treatment and Plaintiff's improvement when compliant with his treatment regimen, which is shown through treatment notes and daily activities when his impairment is controlled. (AR 16-19.) The ALJ also discusses Plaintiff's normal abdominal images during the relevant period which indicated that Plaintiff's abdominal symptoms do not arise from a physical abnormality in his abdomen. (AR 16.)

An unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment can be a basis to discount a claimant's symptom testimony. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits. Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006).

Plaintiff argues that the ALJ should have considered the role of Plaintiff's gastroparesis in his uncontrolled diabetes. Plaintiff asserts that his frequent vomiting, lack of appetite, and feeling full despite not eating created havoc for glucose control. However, the record shows that he was not compliant with his diabetes treatment regimen and that he improved when he was compliant with his treatment regimen. Also, as the ALJ noted, Plaintiff reported that he did not have insurance in July 2013, but the record indicates he is covered under the Fresno County Medically Indigent Services Program and other than the July 2013 notation, the record does not indicate that he has had trouble obtaining insulin for at-home use. (AR 17.)

As the ALJ pointed out, Plaintiff's debilitating symptoms are related to his diabetes, which has been uncontrolled on numerous occasions and he has had abnormally high glucose levels during his emergency room visits. (AR 17, 392, 467, 470, 477, 485, 656, 666, 674, 682, 685, 691, 696, 706, 720, 733, 740, 747, 749, 753, 778, 788, 804, 812, 818, 825, 833, 843, 847, 863, 880, 887, 935.) However, Plaintiff's condition at the emergency room has improved after he receives insulin. (AR 17, 365, 721, 847.)

The record indicates that he is noncompliant with his insulin and other treatments for his diabetes. (AR 17, 468, 654, 692, 745, 747, 896.) On July 13, 2013, when he was hospitalized on

a Saturday for diabetic ketoacidosis, Plaintiff indicated that he had run out of insulin on Wednesday.[3] (AR 17, 89.) Dr. Rajvir K. Basraon, who treated Plaintiff that day, found that Plaintiff's DKA was "[l]ikely triggered with [non-compliance] with insulin with nausea/vomiting and [abdominal] pain." (AR 417, 89.) Dr. Sumon Syed stated in the discharge report for Plaintiff's June 2014 hospital visit that "this was not the first time" that the doctors talked to Plaintiff about his "out of control" blood sugar and advised him "to have small frequent meals and take care of his diabetes." (AR 17-18, 749.) Plaintiff stated that "this time he will for sure be strict and hopefully avoid another admission." (AR 18, 749.) A July 2014 progress note indicates that Plaintiff has a history of poorly controlled diabetes mellitus and gastroparesis and needs better glycemic control. (AR 18, 795.) On August 28, 2014, Plaintiff indicated at a follow-up appointment that he is doing better since his discharge and he is able to tolerate a diet. (AR 18, 812.) An emergency room note from October 28, 2014 notes a history of non-compliance and expressed doubt in Plaintiff's claimed compliance with medications. (AR 18, 847.) Then on November 6, 2014, during a gastroenterology appointment, Plaintiff reported he was adhering to his treatment regimen now and complained of only mild, intermittent mid epigastric pain that is non-radiating and is usually better after eating. (AR 18, 883.) However, on November 23, 2014, he was hospitalized for two days for "DKA, likely 2/2 [non-compliance]." (AR 18, 887.)

The ALJ also noted that while Plaintiff's flare-ups occur on a relatively frequent basis, their effects do not last very long once they have been controlled. (AR 18.) She pointed out that although Plaintiff alleges trouble eating during flare-ups, he reported in July 2014 that he had lost only 10 lbs over the past 6 months despite having visited the ER over 10 times during that span. (AR 18, 377, 792.)

The ALJ also pointed to Plaintiff's daily activities that Plaintiff engages in when he is not experiencing flare-ups to show that he is not particularly debilitated when his impairment is controlled. (AR 19, 32-33, 62-65, 249-252.) Further, she pointed to Plaintiff's abdominal

---

[3] There was a notation that Plaintiff does not have any insurance on this date, but as the ALJ stated, the record otherwise does not indicate that Plaintiff has had trouble obtaining insulin for at-home use. (AR 17.)

12

imaging results not to discredit Plaintiff on that basis itself, but to show that his abdominal symptoms do not arise from a physical abnormality in his abdomen. (AR 16.)

A review of the record demonstrates that there is substantial evidence that Plaintiff failed to comply with the treatment recommendations and that he improved when he did comply with treatment recommendations. Therefore, the Court finds that Plaintiff's failure to comply with the treatment recommendations and improvement when he is complying with medication is a clear and convincing reason for the adverse credibility finding. Accordingly, the ALJ did not err in finding Plaintiff's statements not entirely credible.

### B. Lay Witness Testimony

Plaintiff argues that the ALJ erred in only giving partial weight to the opinion of his lay witness, Ms. Reed, because the only reason that the ALJ provided was that she was not a doctor or otherwise qualified to opine on the medical aspects of Plaintiff's impairments. Plaintiff contends that this error is not harmless. Defendant concedes that the ALJ's reason was not a germane reason for discounting lay witness testimony, but argues that there is no reversible error because the ALJ's reasons for discounting Plaintiff's allegations apply equally to Ms. Reed's statements. In his reply, Plaintiff contends that Ms. Reed's testimony describes limitations beyond those described by Plaintiff and the ALJ's reasons for rejecting Plaintiff's testimony do not equally apply to Ms. Reed's testimony.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." Stout, 454 F.3d at 1053; 20 C.F.R. § 404.1513(d)(4). "Lay witness testimony is competent evidence and cannot be disregarded without comment." Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)). The ALJ must give specific reasons germane to the witness in discounting the lay witness testimony. Stout, 454 F.3d at 1056.

The only reason that the ALJ rejected Ms. Reed's opinion was that she is not a doctor or otherwise qualified to opine on the medical aspects of Plaintiff's impairments. (AR 20.) As Defendant concedes, this is not a permissible reason to reject lay witness testimony.

The issue is whether the ALJ's error is harmless. Where the ALJ provides a clear and

convincing reason to reject Plaintiff's own subjective complaints, and the lay witness testimony is similar to such complaints, the ALJ has provided germane reasons for rejecting the lay witness testimony. Valentine v. Commissioner of Social Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009); see also Molina, 674 F.3d at 1121 ("where the ALJ rejects a witness's testimony without providing germane reasons, but has already provided germane reasons for rejecting similar testimony, we cannot reverse the agency merely because the ALJ did not 'clearly link his determination to those reasons' "). As Plaintiff points out, the first question is whether Ms. Reed's testimony describes any limitations not already described by Plaintiff.

Plaintiff asserts that Ms. Reed's testimony that she observed Plaintiff stay in bed all day sick with abdominal pain, chills, fever, and vomiting 10 to 15 days a month and that she has had to call 911 to have Plaintiff transported to the hospital is beyond the limitations described by Plaintiff. However, Plaintiff testified that he becomes exhausted after vomiting and sleeps several hours during the day. (AR 16, 59-60, 238.) The fact that she has had to call 911 is not a functional limitation and Plaintiff testified that he went to the hospital for his vomiting.

Plaintiff points to Ms. Reed's testimony that Plaintiff's abdominal pain is so intense that she has observed him reduced to tears. However, Plaintiff testified that he has a sharp stomach pain that occurs at least 5 or 6 times a week and lasts for 6 or 7 hours each time. (AR 44-45, 244.) Therefore, Ms. Reed's testimony regarding Plaintiff being reduced to tears because of his abdominal pain is not beyond Plaintiff's testimony.

Plaintiff also points to Ms. Reed's testimony that she estimates Plaintiff cannot lift 30 lbs or walk for 3 blocks without resting. (AR 242.) Plaintiff testified that he needs to rest for 10 minutes after walking two or three blocks and that he can lift 15 lbs. (AR 58, 74.) Therefore, these parts of Ms. Reed's testimony are limitations that were described by Plaintiff.

Plaintiff contends that Ms. Reed's testimony that she assists him with bathing once a week and getting dressed 3 times a week and that Plaintiff needs help to the restroom sometimes is beyond his testimony. (AR 238.) However, the fact that Ms. Reed stated she assisted him with these tasks does not explain why he needed help and is not a functional limitation. Therefore, this testimony is not a functional limitation beyond those alleged by Plaintiff.

Finally, Plaintiff points to Ms. Reed's statement that she finds Plaintiff easily distracted and he cannot focus longer than 10 minutes at a time. (AR 242.) However, Plaintiff stated in his claim submissions that he had issues concentrating and how long he can concentrate for depends on how he is feeling. (AR 252.) Therefore, Ms. Reed's statement is not beyond the limitations alleged by Plaintiff. Thus, Plaintiff's testimony is similar to Ms. Reed's testimony.

The second question is whether the reasons for rejecting Plaintiff's testimony do not equally apply to the testimony of Ms. Reed. Although Plaintiff asserts that the ALJ only rejected Plaintiff's testimony because of his failure to comply with his medication regimen, the ALJ found this reason in conjunction with Plaintiff's improvement when he is complying with medication. The Court finds that this reason provided by the ALJ for rejecting Plaintiff's statements is equally applicable to Ms. Reed's statements.

Accordingly, the Court finds that any error in providing a germane reason to reject Ms. Reed's testimony in this instance would be harmless.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in finding that Plaintiff's statements were not credible and that the error by the ALJ in not providing a germane reason for rejecting Ms. Reed's testimony is harmless.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Timothy Marcus Wiggins. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **December 22, 2017**

UNITED STATES MAGISTRATE JUDGE